IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA BUCKHANON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 3:19-cv-893-ECM |
| | ) | (WO) |
| OPELIKA HOUSING AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.  INTRODUCTION

Plaintiff Barbara Buckhanon ("Buckhanon" or "Plaintiff") brings this employment discrimination action against her employer, the Opelika Housing Authority ("OHA" or "Defendant"), alleging color-based discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  (Doc. 1).  Buckhanon alleges that OHA, through its Executive Director, Matthew McClammey ("McClammey"), treated her less favorably based on her skin color.  The sole remaining claim before the Court is Buckhanon's Title VII color discrimination claim against OHA.  (Doc. 35).

Now pending before the Court is OHA's motion for summary judgment. (Doc. 77). The Plaintiff has filed a response, and the motion is ripe for resolution.  After careful review of the motion, the Plaintiff's response, and the evidentiary materials filed in support of and in opposition to the motion, the Court concludes that the Defendant's motion for summary judgment is due to be granted.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the jurisdictional grant found in 42 U.S.C. § 2000e-5(f)(3).  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.  STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Hornsby-Culpepper,* 906 F.3d at 1311 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient

evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252.  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.*   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV.  FACTS[1]

Plaintiff Barbara Buckhanon is a dark-skinned Black woman.  She began working for the Opelika Housing Authority in 2001. In 2015, at her request, Buckhanon began

---

[1] Because this matter is before the Court on the Defendant's motion for summary judgment, the Court construes the facts in the light most favorable to the non-movant, Buckhanon, and draws all justifiable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

working as the Housing Quality Standards[2] ("HQS") inspector. While employed at OHA, Buckhanon was the only HQS inspector.  Besides a yearly quality control re-inspection of already inspected properties by a Section 8 supervisor, Buckhanon was solely responsible for performing inspections and re-inspections of OHA's Section 8 properties.

As the HQS inspector, Buckhanon was responsible for inspecting Section 8 properties before a new resident moved in, then every year thereafter, and when problems arose ("special inspections").  The inspector is also responsible for reinspecting a property if it has previously failed an inspection.  When a property fails an inspection for health or safety issues, the HQS inspector is required to record the failure, alert the landlord, and schedule a reinspection within 24 hours.  If the landlord does not fix the problem within twenty-four hours, funding will be cut off.  Similarly, if the property fails for a non-health or safety reason, the HQS inspector is required to record the failure, provide notice to the landlord, and schedule a reinspection within two weeks.  If the landlord does not remedy the issue within thirty days, the property's funding is discontinued.

In or around late 2016/early 2017, a fire broke out in an OHA Section 8 property that had been inspected by Buckhanon.  Tragically, four children were killed, and another was seriously injured along with the children's mother.  Buckhanon was ultimately found responsible for failing to adequately inspect the property, and on December 11, 2018, a civil judgment was entered against her.

---

[2] HQS refers to the United States Department of Housing and Urban Development's ("HUD") required minimum quality standards for properties that are used for Section 8 housing assistance.

In 2017, OHA began using a program called "Yardi" to track and schedule inspections.  The Yardi company sent a trainer to Opelika to train OHA staff.  In January 2018, OHA required all employees to use only the Yardi program for tracking and scheduling inspections and re-inspections.

In order to maintain its funding from HUD, OHA is required to participate in Section 8 Management Assessment Program ("SEMAP") certification every year.  SEMAP measures performance in "key Section 8 program areas and [ ] assign[s] performance ratings."  One of the performance indicators is HQS enforcement.

McClammy became the Executive Director of OHA in February 2018.

On June 11, 2018, Buckhanon received a performance evaluation that described her as "prompt," "willing to assist the department," "takes initiative," and "a team player." However, the evaluation also noted, "she must get her arms around pulling the system reports to ensure all inspections are completed.  She cannot rely on the supervisor to inform her when an inspection is late."

On July 30, 2018, Julia Dowell ("Dowell"), a light-skinned Black woman, was named Acting Manager of the Section 8 program and became Buckhanon's immediate supervisor.

Dowell soon began questioning Buckhanon about inspections, re-inspections, and Buckhanon's use of the Yardi program.  Thereafter, when Buckhanon requested additional training on Yardi, Dowell sent her a link to Yardi's eLearning portal.

On October 1, 2018, OHA was notified that it had received a zero HQS enforcement score on its SEMAP certification application for fiscal year 2018, which ran from July 1,

2017 to June 30, 2018.  OHA did not receive a zero in any other SEMAP indicator category. This score caused OHA to drop below "high performer" level to "standard" performer, which impacts its funding.

By November, Dowell was experiencing issues with Buckhanon's work.  For example, instead of giving Dowell information about inspections directly as requested, Buckhanon left the information in Dowell's box.  In an email to Buckhanon, Dowell complained that Buckhanon's work was "lackluster and mediocre."

In January 2019, Buckhanon requested time off for a medical procedure.  At that time, McClammey, a light-skinned Black man, discovered that there were numerous inspections scheduled for the period when Buckhanon was on medical leave. Consequently, McClammey brought in outside inspectors from a company called OHDi to perform inspections while Buckhanon was out.

On February 1, 2019, McClammey and Dowell met with Buckhanon to discuss the zero SEMAP score.  Buckhanon admitted that she had not completed all inspections and re-inspections in a timely manner.  McClammey told Buckhanon that OHA could not receive another zero for HQS enforcement.  McClammey also questioned Buckhanon about where she was going in the OHA truck every day when she left the office.  When asked for the mileage log of her work truck, Buckhanon was unable to explain where she had gone in the OHA truck.  During the meeting, McClammey told Buckhanon that if she did not want to be an inspector anymore, her only alternative was to find other employment.

On February 4, 2019, McClammey and Dowell met with Buckhanon again.  During this meeting, McClammey and Dowell discussed how Buckhanon would be able to perform

the outstanding inspections. Buckhanon admitted that she was late on re-inspections but asserted that she did not know how to find reports and needed more training using the Yardi program.  McClammey told Buckhanon that she needed to take the initiative in learning how to use Yardi and avail herself of the training modules. Buckhanon requested training with another inspector, so McClammey suggested that Buckhanon shadow the OHDi inspector.  According to Buckhanon, McClammey told her she was not to conduct any more HQS inspections and that OHDi was going to conduct the inspections at least for a few months.  In 2019, Buckhanon performed only a fraction of the total inspections that she had performed in previous years.

On February 13, 2019, Buckhanon filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging color discrimination.  In her charge, Buckhanon complained that Dowell and McClammey had "taken a very condescending attitude" towards her and that, in an e-mail, Dowell had questioned her professionalism and character, and described her performance as lackluster and mediocre.  She alleged that upon her return from medical leave, her job had been given to a white male.[3]  Buckhanon also alleged that she had requested extra training but never received it.

For the fiscal year beginning on July 1, 2018, and ending on June 30, 2019, OHA again received a zero for HQS enforcement.

On July 15, 2019, Angela Johnson ("Johnson") became the Director of Operations for OHA.  On August 29, 2019, Johnson, Dowell, and Buckhanon met to discuss instances

---

[3] Buckhanon refers to Toney Fuller, an employee of OHDi, who was contracted to do inspections while Buckhanon was on medical leave but continued to do inspections after she returned to work.

where Buckhanon had failed to schedule re-inspections or notify owners of failed inspections in a timely manner.

On September 6, 2019, McClammey, Johnson, Dowell, and representatives from OHDi met to discuss the zero SEMAP HQS enforcement score. Buckhanon was invited to the meeting, but she did not attend. At that meeting, McClammey asked why OHA had received another zero, and Dowell explained it was because units had not been timely reinspected after failing an initial inspection. A representative from OHDi explained that landlords were not used to failing inspections and proposed that all inspection responsibilities be handed over to OHDi. During that meeting, McClammey determined that Buckhanon would not perform any more inspections; OHDi would handle inspections.

On October 24, 2019, McClammey terminated Buckhanon's employment with OHA.

Buckhanon filed this action on November 18, 2019.

## V.  DISCUSSION

The sole remaining claim before the Court is Buckhanon's claim that she was discriminated against by the Opelika Housing Authority because of the color of her skin in violation of Title VII.[4] Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347

---

[4] Although the Defendant argues that the Plaintiff's hostile work environment claim should be dismissed, a review of the Complaint reveals that the Plaintiff did not plead a hostile work environment claim. Therefore, this claim is not before the Court. Plaintiff's claims under 42 U.S.C. §1983 and the Fair Labor Standards Act were previously dismissed. (Doc. 27).

(2013).  Specifically, the Plaintiff asserts that OHA discriminated against her because she is a dark-skinned Black woman.  The parties do not dispute that Buckhanon can bring a color-based discrimination claim.  Courts have described color discrimination as arising "when the particular hue of the plaintiff's skin is the cause of the discrimination, such as the case where a dark colored African–American individual is discriminated against in favor of a light-colored African–American individual." *Gill v. Bank of Am. Corp.,* 2015 WL 4349935, at *4 (M.D. Fla. July 14, 2015) (citing *Bryant v. Bell Atl. Md. Inc.,* 288 F.3d 124, 133 n.5 (4th Cir. 2002)).

Buckhanon alleges that OHA discriminated against her when it failed to properly train her on the Yardi program, demoted her from the HQS inspector position, and ultimately terminated her because she is dark-skinned.  Buckhanon bears the ultimate burden of proving that the Defendant intentionally discriminated against her.  *Texas Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).  The Eleventh Circuit has consistently held that federal courts, in resolving discrimination claims, do not review the wisdom of an employer's employment decision.  *See e.g., Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 n.16 (11th Cir. 1998) (explaining, "Title VII is not a shield against harsh treatment at the workplace. . . . The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason").

There are different legal theories under which a plaintiff may proceed in a Title VII employment discrimination case.  Indeed, Title VII not only prohibits discrimination because of an employee's color (single-motive theory), but also prohibits adverse

employment actions upon which color was a motivating factor (mixed-motive theory). When a plaintiff predicates her Title VII color discrimination claim on a single-motive theory, the *McDonnell Douglas*[5] analytical framework is appropriate. When a plaintiff predicates her Title VII color discrimination claim on a mixed-motive theory, the *McDonnell Douglas* analysis is not appropriate. A mixed-motive discrimination claim is examined under the inquiry articulated in *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016): "whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." 814 F.3d at 1239 (citations and quotations omitted).

In its motion for summary judgment, the OHA analyzes Buckhanon's claims under the familiar *McDonnell Douglas* burden-shifting framework. In her opposition to the motion for summary judgment, Buckhanon articulates the *McDonnell Douglas* burden-shifting analysis, the *Quigg* motivating factor inquiry, and but-for causation under *Bostock v. Clayton County, GA*, 140 S.Ct. 1731 (2020). However, Buckhanon fails to identify the appropriate legal framework under which to analyze her claim. Instead, she appears to assert that she can prevail under all the Title VII frameworks. In so doing, the Court is left to sort out the nature of Buckhanon's discrimination claim and thus determine the appropriate legal analysis.

Looking first to the Complaint, the Court notes that the Plaintiff alleges "employment discrimination based on color." (Doc. 1 at 1). The Plaintiff also references

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

"pretext" in relation to stated reasons for employment decisions (doc. 1 at 5, para. 24; doc. 1 at 7, paras. 31 and 33). Buckhanon generally pled that her "color was a motivating factor, moving force, and/or otherwise influenced OHA's employment decisions…," but she does not plead that OHA had mixed motives in making employment decisions. (Doc. 1 at 16, para. 67).

Turning next to the Plaintiff's summary judgment briefing, the Court finds shifting, inconsistent arguments. Citing to *Bostock*, Buckhanon asserts that "a reasonable jury could find that but-for Plaintiff's color, but for Plaintiff being a dark-skinned Black person, OHA would not have [undertaken adverse employment actions]." (Doc. 81 at 27). Citing to *Quigg*, Buckhanon argues that "[a]s long as [she] can show 'her protected characteristic,' being a dark-skinned Black employee, was '**a**' motivating factor,' in the adverse employment actions taken against her – all leading up to her termination, then [sic] presents an issue for trial under a motivating factor test." (Doc. 81 at 31). Citing to *McDonnell Douglas*, Buckhanon argues that she has identified comparators who "were given deferential workplace treatment," that "this case does not need *McDonnell Douglas* pretext," and that "a reasonable jury could find that OHA perpetuated adverse employment actions against Plaintiff because of the color of her skin." (Doc. 81 at 37-39). Buckhanon asserts that under all three analyses (*Bostock*, *Quigg*, and *McDonnell Douglas*),

> Plaintiff provides sufficient evidence to proceed to trial. Plaintiff provides sufficient evidence to enable a reasonable juror to find color-based workplace discrimination. Evidence points to, and a reasonable person could certainly conclude, that but for plaintiff Buckhanon's being a dark-skinned Black woman, OHA would not have so negatively, adversely, altered her workplace terms and conditions. This simple fact and the

> law regarding it is what this case's legal analysis and test turns
> on.

(Doc. 81 at 25).

Buckhanon did not plead in her Complaint that OHA had mixed motives in making decisions related to her employment.  Instead, she alleges discrimination based on color and referenced pretextual actions taken by OHA.  Further, Buckhanon, in her summary judgment briefing, focused on a single motive, color, for the adverse employment actions alleged.  The few references to a mixed-motive theory in Buckhanon's briefing were conclusory and unsupported by the evidence.  "To withstand summary judgment [in a mixed-motive case], [Plaintiff] needed to submit evidence sufficient to convince a jury that she was terminated for both legitimate and illegitimate reasons, with the illegitimate reason being a motivating factor in the termination decision." *Fonte v. Lee Memorial Health System*, 2021 WL 5368096 (11th Cir. Nov. 18, 2021) (finding that the district court properly applied the single motive framework where the plaintiff made mention of motivating factors for an adverse employment action but did not elaborate on them).[6]  The Plaintiff failed to submit evidence of a mixed motive; therefore, the Court finds that Buckhanon brings a single-motive claim and thus, the *McDonnell Douglas* analysis is appropriate.

    *A.  McDonnell Douglas Framework*

To defeat the Defendant's motion for summary judgment, Buckhanon must first establish a prima facie case of discrimination by one of three generally accepted methods:

---

[6]  The Court recognizes that this is unpublished opinion is not binding precedent.  However, the Court finds its analysis persuasive.

(1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell Douglas*; or (3) presenting statistical proof.  *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).  The Plaintiff offers neither direct nor statistical evidence, but instead points to circumstantial evidence to support her claim.

Because the Plaintiff relies on circumstantial evidence to support her color discrimination claim, the Court first turns to the *McDonnell Douglas*[7] framework to determine whether Buckhanon survives summary judgment.  To be successful, Buckhanon must first establish a *prima facie* case of discrimination.  If Buckhanon establishes a *prima facie* case, the burden shifts to OHA to produce "some legitimate, non-discriminatory reason" for the challenged employment action. *See McDonnell*, 411 U.S. at 802.  If OHA satisfies this burden, Buckhanon must then establish, by a preponderance of the evidence, that the articulated reasons were mere pretext for intentional discrimination.  *Burdine,* 450 U.S. at 256.  At all times, the ultimate burden of persuasion remains with the Plaintiff to show that the Defendant intentionally discriminated against her. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).  In the summary judgment context, Buckhanon need only present evidence from which a reasonable trier of fact could conclude the Defendant intentionally discriminated against her based on her color.

---

[7]  Although the Plaintiff acknowledges and argues the merits of her claim under the *McDonnell Douglas* paradigm, she also argues that the framework is outdated and has been obviated by case law.  This Court is bound by Supreme Court and Eleventh Circuit precedent, and the use of the *McDonnell Douglas* framework in employment discrimination cases is appropriate.

### i. *Prima face case*

To establish a *prima facie* case of disparate treatment based on her color, Buckhanon must show that: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated similarly situated employees outside her class more favorably treated." *Lewis v. City of Union City, Georgia,* 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) (emphasis in original).

The Defendant concedes that Buckhanon is a member of a protected class as a "darker colored African-American" and "assume[s] . . . she was qualified for her job." (Doc. 79 at 60). However, the Defendant argues that Buckhanon cannot establish a *prima facie* case of color discrimination because she cannot show that she was subject to an adverse employment action or that similarly situated employees outside her class were treated more favorably. (*Id*. at 69–70).

### a. Adverse employment actions

Turning to the adverse employment action prong, Buckhanon contends that she suffered adverse employment actions[8] when her responsibilities were substantially reduced

---

[8] Buckhanon complains about Dowell's email in which she questioned Buckhanon's work. Reprimands received from supervisors, while unpleasant, are routinely found to fall short of the "serious and material" threshold necessary to be considered adverse employment actions. *Summerlin v. M & H Valve Co.,* 167 F. App'x 93, 97 (11th Cir. 2006) ("The reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result."). The Court concludes that, to the extent Buckhanon complains about reprimands, such actions do not rise to the level of adverse employment actions.

Buckhanon also suggests that having notes written about her by her supervisor and being under more surveillance than in the past constitute adverse employment actions. (Doc. 81 at 17). However, courts have held that "increased supervision cannot reasonably be considered 'adverse.'" *Rapson v. Dev. Auth. of Peachtree City,* 2004 WL 1944846, at *6 (N.D. Ga. Mar. 31, 2004); *see also Harbuck v. Teets,* 152 F. App'x 846, 848 (11th Cir. 2005) (holding that heightened scrutiny of plaintiff not an "adverse employment action").

when she returned from medical leave in February 2019; when she was denied training on Yardi; and when she was ultimately terminated.[9]

To constitute an "adverse employment action," the Plaintiff must establish that a decision of the employer "impact[ed] the terms, conditions, or privileges of [her] job in a real and demonstrable way." *Jefferson,* 891 F.3d at 920–21 (citing *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001)). This "impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Jefferson,* 891 F.3d at 921. "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761 (1998) (emphasis added).

Although she presents no evidence that her job title, pay, or benefits were altered, Buckhanon argues that, after she returned from medical leave, she was transferred or demoted when McClammey said she was not conducting inspections anymore. Buckhanon asserts that the change in her responsibilities resulted in "occasionally shadowing OHDI

---

[9] The Defendant asserts that the Plaintiff cannot rely on her termination as an adverse employment action because it was not included in her EEOC charge. While the Plaintiff is constrained by the allegations contained in her February 2019 EEOC charge, Buckhanon asserted in the charge that she was "being set up for failure and subjected to a paper trail that may lead to my termination." (Doc. 81-2 at 3). For the purpose of establishing a *prima facie* case, the Court will assume that the Plaintiff's termination in October 2019 is sufficiently intertwined with her complaints of color discrimination and will consider her termination an adverse employment action.

(sic), doing back-office work, occasionally filling-in for other inspectors, being expected to do support paperwork." (Doc. 81 at 40).

"[A]pplying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on [her] disagreement with [her] employer's reassignment of job tasks." *Davis*, 245 F.3d at 1244.  And as the *Davis* Court noted, other Circuits have been "reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm." *Id.* (citing *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1557 (D.C. Cir. 1997)).  However, a change in work assignments or responsibilities could rise to the level of an adverse employment action when "in unusual instances the change [in assignments or responsibilities] may be so substantial and material that it does indeed alter the terms, conditions, or privileges of employment." *Id.* at 1245 (alteration added) (internal quotations removed).  The Court reiterated its caution that [i]n the vast majority of instances . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause." *Id.* (alteration added). *See also Kidd v. Mando Am. Corp*., 731 F.3d 1196, 1203–4 (11th Cir. 2013) (removing supervisory responsibilities of the vacant assistant account manager position with no change in pay or title did not constitute an adverse employment action).

Taking the facts in the light most favorable to the Plaintiff, the Court concludes that, at the *prima facie* stage, the Defendant's reassignment of Buckhanon's inspection duties to a contracted individual constitutes a substantial and material change to the terms and conditions of her employment.  Although there was no reduction in her pay, benefits, or

title, the reassignment resulted in the removal of most, if not all, of her inspection duties as the HQS inspector.  The Plaintiff was instead tasked with "occasionally shadowing OHDI (sic), doing back-office work, occasionally filling-in for other inspectors, being expected to do support paperwork."  Moreover, although Buckhanon was told that "they [OHDi inspectors] were going to remain for several months," (doc. 78-1 at 19), it appears that OHDi continued doing the lion's share of the inspections—the core of her responsibilities—until Buckhanon's termination.[10]  Removing the Plaintiff's inspection duties is, in this case, substantial enough to constitute an adverse employment action.[11]

In sum, the Court concludes that Buckhanon has demonstrated that she suffered adverse employment actions for the purposes of establishing a *prima facie* case because her job responsibilities were significantly reduced, and she was ultimately terminated.

b.  Comparators

To make out a *prima facie* case for employment discrimination based on disparate treatment, Buckhanon must also show that she was treated worse than other similarly situated employees who were outside of her protected class.  Thus, she must show that she was treated less favorably than lighter-skinned Black people.  The Defendant argues that the Plaintiff cannot show any similarly situated compactors were treated less favorably.

---

[10]  It is undisputed that after Buckhanon's termination, McClammey eliminated the HSQ inspector position and contracted with OHDi to perform all inspections and re-inspections.

[11]  The Plaintiff also argues that OHA's failure to provide her adequate training opportunities on the Yardi system constitutes an adverse employment action.  (Doc. 81 at 39).  The Plaintiff contends that an employee can establish an adverse employment action "if the plaintiff can establish that the employer denied material training opportunities to [her]." *Johnson v. Gestamp Alabama, LLC*, 946 F. Supp. 2d 1180, 1202 (N.D. Ala. 2013).  Here, the evidence shows that the Plaintiff was afforded training opportunities on the Yardi system. Therefore, the Plaintiff fails to establish an adverse employment action with respect to training.

(Doc. 79 at 66). The Plaintiff identifies Julia Dowell, Crystal Allen, and Gemelia Welch as comparators.[12] (Doc. 81 at 37).

The Eleventh Circuit has emphasized that the comparator analysis is central to establishing the *prima facie* case because "it is only by demonstrating that [an] employer has treated 'like' employees 'differently'—*i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination.*" *Lewis*, 918 F.3d at 1223 (emphasis in original). A plaintiff and comparator must be "similarly situated in all material respects." *Id.* at 1226. To determine if a plaintiff and potential comparator were "similarly situated in all material respects," the Court considers whether they both (1) engaged in the same basic conduct (or misconduct) as the plaintiff; (2) were subject to the same employment policies, guidelines, or rules as the plaintiff; (3) were under the same supervisor; and (4) share the same employment and disciplinary history. *Lewis*, 918 F.3d at 1227–28.

### i. Julia Dowell

The Plaintiff argues Dowell is an appropriate comparator because she is a light-skinned Black woman who received more favorable treatment than her. (Doc. 81 at 8–9). Specifically, Buckhanon asserts that Dowell failed to remove a tenant from Section 8 program housing for noncompliance after Buckhanon told her about an issue, Dowell made mistakes entering inspection data, but Dowell was not fired for these mistakes. (*Id.* at 9–10).

---

[12] Although not identified by the Plaintiff, the Defendant suggests that the OHDi contractors are potential comparators. It is undisputed that the OHDi contractors were not employees of OHA, and, thus, the Court does not consider them "similarly situated employees" for the purpose of establishing the *prima facie* case.

However, the Court finds that Dowell is not a proper comparator to Buckhanon because they were not "similarly situated in all material respects." First, they were not engaged in the same basic conduct. Dowell did not perform inspections or re-inspections. The Plaintiff failed to perform or schedule timely re-inspections which resulted in OHA receiving a zero SEMAP score for HQS enforcement two years in a row. Dowell was not responsible for the zero SEMAP score; rather, she failed to remove a tenant and erred entering data into the OHA database. The only evidence the Plaintiff puts forth that she and Dowell were subject to the same rules is her statement that they were both subject to the same policies and work rules. However, Dowell was the Plaintiff's supervisor, not her co-worker, and there is no evidence in the record regarding Dowell's employment and discipline history. Because Buckhanon has failed to demonstrate that Dowell is similarly situated in all material respects, she is not appropriate comparator.

### ii. Crystal Allen, and Gemelia Welch

Buckhanon alleges that Allen and Welch are valid comparators and were treated more favorably than she was. Specifically, Buckhanon argues that Welch and Allen, who are lighter-skinned Black people, were hired as assistant property managers, even though neither of them possessed a valid driver's license—an OHA job requirement. (Doc. 81 at 6). Buckhanon also argues that they are were similarly situated because "Allen, Welch and Buckhanon all put information into OHA's system regarding tenants and clients; all three had to pull criminal reports; all three had to do background checks; all had to make sure people were qualified for the unit that they were going in." (*Id.* at 16). And the Plaintiff also notes that both Allen and Welch were hired to do inspections. (*Id.* at 7). However, the

undisputed evidence before the Court demonstrates that Allen and Welch were hired as assistant property managers, not HQS inspectors, and they did not conduct HQS inspections.  Thus, neither Allen nor Welch are proper comparators to the Plaintiff.

Moreover, the Plaintiff points to no evidence that Allen or Welch were engaged in the same misconduct as she was, were supervised by the same supervisor, or shared similar employment or disciplinary histories.[13]  Therefore, Allen and Welch are not "similarly situated in all material respects" to the Plaintiff, and neither is an appropriate comparator.

Because the Plaintiff fails to identify a similarly situated comparator, the Plaintiff cannot make out a *prima facie* case under the *McDonnell Douglas* burden shifting framework.

### ii. Legitimate non-discriminatory reasons

Even assuming that Buckhanon could establish a *prima facie* case of intentional discrimination, the Defendant has asserted legitimate non-discriminatory reasons for its employment decision to substantially reduce Buckhanon's inspection responsibilities and ultimately terminate her.  This is a burden of production, not persuasion.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).  OHA "need not persuade the court that it was actually motivated by the proffered reasons." *Id*. (quoting *Burdine*, 450 U.S. at 254).  Rather, OHA can rebut the presumption of discrimination by articulating a non-

---

[13] Buckhanon alleges Allen was "given" as pass for alleged misconduct attributed to her.  Allegedly, Allen violated OHA policy violation when Allen told a housing manager that a coworker had been made a full-time employee and had gotten a raise.  According to Buckhanon, when McClammey was found out, he said "it was not done maliciously or intentional[ly], and he gave Allen a pass." Even accepting this allegation as true, this is not comparable to the Plaintiff's failures to perform timely inspections and re-inspections which resulted in the zero SEMAP scores.

discriminatory reason for the employment action.  Thereafter, the burden shifts back to the Plaintiff to show that the articulated reasons are simply pretext for discrimination.  *Id*.

The OHA proffers that OHDi was brought in to conduct inspections initially because Buckhanon was on medical leave, and the inspections and re-inspections needed to be completed.  Thereafter, Buckhanon was removed from conducting inspections and re-inspections because she was admittedly late in scheduling and conducting the inspections.  Finally, OHA proffers that the employment actions taken against Buckhanon were initiated as a result of the first zero HQS Enforcement SEMAP score and culminated with the receipt of the second zero HQS Enforcement SEMAP score. The Defendant's proffered legitimate, non-discriminatory reasons are supported by evidence in the record. Indeed, Buckhanon does not dispute that she was late with inspections and re-inspections. Nor does she dispute that she was responsible for the first zero SEMAP score.  She also does not contest that although she did not conduct many inspections in 2019, she was still responsible for scheduling inspections and did not schedule inspections or re-inspections in a timely manner, which resulted in the second zero HSQ Enforcement SEMAP score. The Defendant has satisfied its burden of production.

### iii.  Pretext

Upon Defendant's production of a legitimate nondiscriminatory reason for the adverse employment actions, the presumption in favor of the Plaintiff is rebutted and falls away. *Burdine*, 450 U.S. at 255.  The burden shifts back to Buckhanon to show that the Defendant's explanation is pretextual, and that color discrimination motivated OHA. *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 143 (2000).

A plaintiff can show pretext by "directly persuading the court that a discriminatory reason more likely motivated the employer" or indirectly that the employer's explanation is not believable. *Burdine*, 450 U.S. at 256 (1981).  The Plaintiff must show that the Defendant's "proffered reason was not its true reason, which merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against her." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).  The Plaintiff's color discrimination claim also fails here.

In order to show pretext, the Plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez*, 610 F.3d at 1265 (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  In some cases, proof that an employer's asserted justification is false, when coupled with the evidence establishing the plaintiff's *prima facie* case, is sufficient to permit an inference of discrimination. *See Reeves*, 530 U.S. at 148. However, Buckhanon's evidence of pretext is entirely rooted in her own beliefs and inferences, and relies on unsubstantiated allegations and conclusory statements which is simply insufficient to meet her burden.  "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987); *see also Carter*, 132 F.3d at 642 (conclusory allegations without specific supporting facts have no probative value).

> Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal . . . What the law does require is

> that an employer not discriminate against an employee on the
> basis of the employee's protected class characteristics.

*E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1319 (10th Cir. 1992).

Accordingly, Buckhanon cannot show a genuine issue of material fact exists with respect to pretext.

### B.  Convincing Mosaic of Circumstantial Evidence

Alternatively, Buckhanon can "survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328.  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.*

Buckhanon may establish a convincing mosaic by pointing to evidence that demonstrates "(1) suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (alteration in original).  Moreover, "[n]ot every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator," so failure to produce one does not necessarily doom the plaintiff's case.  *Id.*

Here, the Court considers whether the Plaintiff can assemble a convincing mosaic based on "suspicious timing, ambiguous statements . . . and other bits and pieces from

which the inference of discriminatory intent might be drawn" or "systematically better treatment of similarly situated employees."

Turning first to the Plaintiff's evidence that allegedly shows that other lighter-skinned Black people were treated better than she was, Buckhanon points to the hiring of Allen and Welch as assistant property managers despite the fact that neither had a valid driver's license.   Although the parties contest how long each employee had to obtain a driver's license, the Plaintiff does not contest the Defendant's assertion that Welch was terminated when she unable to get her license.  Although Buckhanon implies that Allen and Welch were treated differently because they were lighter-skinned, the evidence does not demonstrate that McClammey acted in a way that could reveal an intent to discriminate against darker-skinned Black people.

Although the Plaintiff claims that McClammey had a "close, hands-on, working relationship with light-skinned Julia Dowell," this does not evidence an intent to discriminate against Buckhanon.  Further, while the Plaintiff asserts that Dowell committed errors in her work, Buckhanon has failed to demonstrate that Dowell's errors were tantamount to her failures to conduct inspections and re-inspections which resulted in the two zero HQS Enforcement scores.

The Plaintiff fails to produce evidence of systematically better treatment of lighter-colored Black people or evidence that lighter-skinned coworkers were treated better than she was under the same circumstances.[14]

---

[14]  The Plaintiff points to McClammey's alleged "affinity for light-skinned women;" Toya Henderson's statement that she had "witnessed a large amount of discrimination towards [ ] women of darker complexion;" and Anthony Brock's comment that he "noticed some things that [he] didn't think was fair, but that doesn't necessarily mean [McClammey] discriminates because of skin color" to support her claim.

Relying on an evaluation for an assistant manager position, Buckhanon argues that there is no explanation other than color discrimination for why McClammey's evaluation of her changed so radically from October 2018 to November 2019.  Although McClammey completed the evaluation two months after the first zero SEMAP score, Buckhanon disregards evidence that, in February 2019, two meetings were held with her to address the first zero HSQ Enforcement SEMAP score, which she agreed was her fault.  In these meetings, it was made clear to the Plaintiff that many of her inspecting duties would be transferred to OHDi so that she could catch up on past inspections and learn the scheduling system.  She was also advised that a second zero  HSQ Enforcement SEMAP score would be unacceptable.

Next, the Plaintiff argues that McClammey's failure to provide sufficient training on color discrimination by offering a course or attending one himself, coupled with his alleged lack of understanding of colorism, is indicative of discrimination.   However, it is undisputed that any form of discrimination was prohibited in the employee handbook. And although the Plaintiff points to McClammey's deposition testimony regarding color discrimination, a careful review of his testimony demonstrates that, during his testimony, McClammey testified that he had never "been involved in any form of discrimination, nor would [he] allow it to exist."  The evidence identified by the Plaintiff is insufficient for a reasonable jury to determine that the Defendant intentionally discriminated against the Plaintiff based on her color.[15]

_____

However, the Court does not credit these conclusory statements and finds them insufficient to show intentional discrimination.

[15] Although the Court determined that analysis of the Plaintiff's claims under *Quigg* was not appropriate, even if *Quigg* did govern the claims, the outcome would be the same.  "An employee can succeed on a

## VI.  CONCLUSION

For the reasons as stated, and for good cause, it is

ORDERED that the Defendant's Motion for Summary Judgment, (doc. 77), is GRANTED, and this case is DISMISSED with prejudice.

A separate final judgment will be entered.

DONE this 29th day of September, 2022.

_/s/ Emily C. Marks_
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE

---

mixed-motive claim by showing that illegal bias . . . 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e-2(m)).  The Plaintiff fails to produce evidence that her color was a motivating factor in the adverse employment actions.